## EGELHOFF *v.* EGELHOFF, A MINOR, BY AND THROUGH HER NATURAL PARENT, BREINER, ET AL.

No. 99–1529.   Argued November 8, 2000—Decided March 21, 2001

142

*William J. Kilberg* argued the cause for petitioner. With him on the briefs were *Thomas G. Hungar* and *Henry Haas.*

*Barbara McDowell* argued the cause for the United States as *amicus curiae* urging reversal. With her on the brief were *Solicitor General Waxman, Assistant Attorney General Ogden, Deputy Solicitor General Kneedler, Henry L. Solano, Nathaniel I. Spiller,* and *Elizabeth Hopkins.*

*Thomas C. Goldstein* argued the cause for respondents. With him on the brief were *Erik S. Jaffe* and *Michael W. Jordan.**

JUSTICE THOMAS delivered the opinion of the Court.

A Washington statute provides that the designation of a spouse as the beneficiary of a nonprobate asset is revoked automatically upon divorce. We are asked to decide whether the Employee Retirement Income Security Act of 1974 (ERISA), 88 Stat. 832, 29 U. S. C. § 1001 *et seq.*, preempts that statute to the extent it applies to ERISA plans. We hold that it does.

---

*Briefs of *amici curiae* urging reversal were filed for the AARP by *Mary Ellen Signorille* and *Melvin Radowitz;* for the Boeing Co. et al. by *Bruce D. Corker, Kurt E. Lisnenmayer, Paul J. Ehlenbach, Loretta B. Kepler, Stephen A. Bokat,* and *Jan Amundson;* for the National Coordinating Committee for Multiemployer Plans by *Denise M. Clark* and *Mark C. Nielsen;* and for the Western Conference of Teamsters Pension Trust Fund by *Robert S. Unger, Russell J. Reid,* and *Michael R. McCarthy.*

Briefs of *amici curiae* urging affirmance were filed for the State of Washington et al. by *Christine O. Gregoire,* Attorney General of Washington, *Jay D. Geck,* Assistant Attorney General, and *William Berggren Collins,* Senior Assistant Attorney General, and by the Attorneys General for their respective States as follows: *Mark Pryor* of Arkansas, *Ken Salazar* of Colorado, *Thomas F. Reilly* of Massachusetts, *Joseph P. Mazurek* of Montana, *W. A. Drew Edmondson* of Oklahoma, *Jan Graham* of Utah, *William H. Sorrell* of Vermont, and *Darrell V. McGraw, Jr.,* of West Virginia; and for the National Conference of State Legislatures et al. by *Richard Ruda* and *James I. Crowley.*

I

Petitioner Donna Rae Egelhoff was married to David A. Egelhoff. Mr. Egelhoff was employed by the Boeing Company, which provided him with a life insurance policy and a pension plan. Both plans were governed by ERISA, and Mr. Egelhoff designated his wife as the beneficiary under both. In April 1994, the Egelhoffs divorced. Just over two months later, Mr. Egelhoff died intestate following an automobile accident. At that time, Mrs. Egelhoff remained the listed beneficiary under both the life insurance policy and the pension plan. The life insurance proceeds, totaling $46,000, were paid to her.

Respondents Samantha and David Egelhoff, Mr. Egelhoff's children by a previous marriage, are his statutory heirs under state law. They sued petitioner in Washington state court to recover the life insurance proceeds. Respondents relied on a Washington statute that provides:

> "If a marriage is dissolved or invalidated, a provision made prior to that event that relates to the payment or transfer at death of the decedent's interest in a nonprobate asset in favor of or granting an interest or power to the decedent's former spouse is revoked. A provision affected by this section must be interpreted, and the nonprobate asset affected passes, as if the former spouse failed to survive the decedent, having died at the time of entry of the decree of dissolution or declaration of invalidity." Wash. Rev. Code § 11.07.010(2)(a) (1994).

That statute applies to "all nonprobate assets, wherever situated, held at the time of entry by a superior court of this state of a decree of dissolution of marriage or a declaration of invalidity." § 11.07.010(1). It defines "nonprobate asset" to include "a life insurance policy, employee benefit plan, annuity or similar contract, or individual retirement account." § 11.07.010(5)(a).

Respondents argued that they were entitled to the life insurance proceeds because the Washington statute disqualified Mrs. Egelhoff as a beneficiary, and in the absence of a qualified named beneficiary, the proceeds would pass to them as Mr. Egelhoff's heirs. In a separate action, respondents also sued to recover the pension plan benefits. Respondents again argued that the Washington statute disqualified Mrs. Egelhoff as a beneficiary and they were thus entitled to the benefits under the plan.

The trial courts, concluding that both the insurance policy and the pension plan "should be administered in accordance" with ERISA, granted summary judgment to petitioner in both cases. App. to Pet. for Cert. 46a, 48a. The Washington Court of Appeals consolidated the cases and reversed. *In re Estate of Egelhoff*, 93 Wash. App. 314, 968 P. 2d 924 (1998). It concluded that the Washington statute was not pre-empted by ERISA. *Id.*, at 317, 968 P. 2d, at 925. Applying the statute, it held that respondents were entitled to the proceeds of both the insurance policy and the pension plan. *Ibid.*

The Supreme Court of Washington affirmed. 139 Wash. 2d 557, 989 P. 2d 80 (1999). It held that the state statute, although applicable to "employee benefit plan[s]," does not "refe[r] to" ERISA plans to an extent that would require pre-emption, because it "does not apply immediately and exclusively to an ERISA plan, nor is the existence of such a plan essential to operation of the statute." *Id.*, at 574, 989 P. 2d, at 89. It also held that the statute lacks a "connection with" an ERISA plan that would compel pre-emption. *Id.*, at 576, 989 P. 2d, at 90. It emphasized that the statute "does not alter the nature of the plan itself, the administrator's fiduciary duties, or the requirements for plan administration." *Id.*, at 575, 989 P. 2d, at 90. Nor, the court concluded, does the statute conflict with any specific provision of ERISA, including the antialienation provision, 29 U. S. C. § 1056(d)(1), because it "does not operate to divert benefit

plan proceeds from distribution under terms of the plan documents," but merely alters "the underlying circumstances to which the distribution scheme of [the] plan must be applied." 139 Wash. 2d, at 578, 989 P. 2d, at 91.

Courts have disagreed about whether statutes like that of Washington are pre-empted by ERISA. Compare, *e. g.,* *Manning* v. *Hayes,* 212 F. 3d 866 (CA5 2000) (finding pre-emption), cert. pending, No. 00–265, ▮ and *Metropolitan Life Ins. Co.* v. *Hanslip,* 939 F. 2d 904 (CA10 1991) (same), with, *e. g., Emard* v. *Hughes Aircraft Co.,* 153 F. 3d 949 (CA9 1998) (finding no pre-emption), and 139 Wash. 2d, at 557, 989 P. 2d, at 80 (same). To resolve the conflict, we granted certiorari. 530 U. S. 1242 (2000).

## II

Petitioner argues that the Washington statute falls within the terms of ERISA's express pre-emption provision and that it is pre-empted by ERISA under traditional principles of conflict pre-emption. Because we conclude that the statute is expressly pre-empted by ERISA, we address only the first argument.

ERISA's pre-emption section, 29 U. S. C. §1144(a), states that ERISA "shall supersede any and all State laws insofar as they may now or hereafter relate to any employee benefit plan" covered by ERISA. We have observed repeatedly that this broadly worded provision is "clearly expansive." *New York State Conference of Blue Cross & Blue Shield Plans* v. *Travelers Ins. Co.,* 514 U. S. 645, 655 (1995); see, *e. g., Morales* v. *Trans World Airlines, Inc.,* 504 U. S. 374, 384 (1992) (listing cases in which we have described ERISA pre-emption in broad terms). But at the same time, we have recognized that the term "relate to" cannot be taken "to extend to the furthest stretch of its indeterminacy," or else "for all practical purposes pre-emption would never run its course." *Travelers, supra,* at 655.

We have held that a state law relates to an ERISA plan "if it has a connection with or reference to such a plan." *Shaw* v. *Delta Air Lines, Inc.*, 463 U. S. 85, 97 (1983). Petitioner focuses on the "connection with" part of this inquiry. Acknowledging that "connection with" is scarcely more restrictive than "relate to," we have cautioned against an "uncritical literalism" that would make pre-emption turn on "infinite connections." *Travelers, supra*, at 656. Instead, "to determine whether a state law has the forbidden connection, we look both to 'the objectives of the ERISA statute as a guide to the scope of the state law that Congress understood would survive,' as well as to the nature of the effect of the state law on ERISA plans." *California Div. of Labor Standards Enforcement* v. *Dillingham Constr., N. A., Inc.*, 519 U. S. 316, 325 (1997), quoting *Travelers, supra*, at 656 (citation omitted).

Applying this framework, petitioner argues that the Washington statute has an impermissible connection with ERISA plans. We agree. The statute binds ERISA plan administrators to a particular choice of rules for determining beneficiary status. The administrators must pay benefits to the beneficiaries chosen by state law, rather than to those identified in the plan documents. The statute thus implicates an area of core ERISA concern. In particular, it runs counter to ERISA's commands that a plan shall "specify the basis on which payments are made to and from the plan," § 1102(b)(4), and that the fiduciary shall administer the plan "in accordance with the documents and instruments governing the plan," § 1104(a)(1)(D), making payments to a "beneficiary" who is "designated by a participant, or by the terms of [the] plan." § 1002(8).[1] In other words, unlike generally applica-

---

[1] One can of course escape the conflict between the plan documents (which require making payments to the named beneficiary) and the statute (which requires making payments to someone else) by calling the statute an "invalidation" of the designation of the named beneficiary, and by ob-

ble laws regulating "areas where ERISA has nothing to say," *Dillingham*, 519 U. S., at 330, which we have upheld notwithstanding their incidental effect on ERISA plans, see, *e. g., ibid.*, this statute governs the payment of benefits, a central matter of plan administration.

The Washington statute also has a prohibited connection with ERISA plans because it interferes with nationally uniform plan administration. One of the principal goals of ERISA is to enable employers "to establish a uniform administrative scheme, which provides a set of standard procedures to guide processing of claims and disbursement of benefits." *Fort Halifax Packing Co.* v. *Coyne*, 482 U. S. 1, 9 (1987). Uniformity is impossible, however, if plans are subject to different legal obligations in different States.

The Washington statute at issue here poses precisely that threat. Plan administrators cannot make payments simply by identifying the beneficiary specified by the plan documents.[2] Instead they must familiarize themselves with

serving that the plan documents are silent on whether "invalidation" is to occur upon divorce. The dissent employs just such an approach. See *post*, at 155–156 (opinion of BREYER, J.). Reading a clear statement as an ambiguous metastatement enables one to avoid all kinds of conflicts between seemingly contradictory texts. Suppose, for example, that the statute required that all pension benefits be paid to the Governor of Washington. That seems inconsistent with the plan documents (and with ERISA), but the inconsistency disappears if one calls the statute an "invalidation" of the principal and alternate beneficiary designations. After all, neither the plan nor ERISA actually *says* that beneficiaries *cannot* be invalidated in favor of the Governor. This approach exploits the logical inability of any text to contain a complete set of instructions for its own interpretation. It has the vice—or perhaps the virtue, depending upon one's point of view—of draining all language of its meaning.

[2] Respondents argue that in this case, the disposition dictated by the Washington statute is consistent with that specified in the plan documents. Because Mr. Egelhoff designated "Donna R. Egelhoff wife" as the beneficiary of the life insurance policy, they contend that once the Egelhoffs divorced, "there was no such person as 'Donna R. Egelhoff *wife*'; the designated person had definitionally ceased to exist." Brief for Respondents 44 (emphasis in original); see also *post*, at 155 (BREYER, J., dissenting). In effect, respondents ask us to infer that what Mr. Egelhoff meant when

state statutes so that they can determine whether the named beneficiary's status has been "revoked" by operation of law. And in this context the burden is exacerbated by the choice-of-law problems that may confront an administrator when the employer is located in one State, the plan participant lives in another, and the participant's former spouse lives in a third. In such a situation, administrators might find that plan payments are subject to conflicting legal obligations.

To be sure, the Washington statute protects administrators from liability for making payments to the named beneficiary unless they have "actual knowledge of the dissolution or other invalidation of marriage," Wash. Rev. Code § 11.07.010(3)(a) (1994), and it permits administrators to refuse to make payments until any dispute among putative beneficiaries is resolved, § 11.07.010(3)(b). But if administrators do pay benefits, they will face the risk that a court might later find that they had "actual knowledge" of a divorce. If they instead decide to await the results of litigation before paying benefits, they will simply transfer to the beneficiaries the costs of delay and uncertainty.[3] Requiring ERISA administrators to master the relevant laws of 50 States and to contend with litigation would undermine the

---

he filled out the form was not "Donna R. Egelhoff, who is my wife," but rather "a new legal person—'Donna as spouse,'" Brief for Respondents 44. They do not mention, however, that below the "Beneficiary" line on the form, the printed text reads, "First Name [space] Middle Initial [space] Last Name [space] Relationship." See Appendix to opinion of BREYER, J., post. Rather than impute to Mr. Egelhoff the unnatural (and indeed absurd) literalism suggested by respondents, we conclude that he simply provided all of the information requested by the form. The happenstance that "Relationship" was on the same line as the beneficiary's name does not, we think, evince an intent to designate "a new legal person."

[3] The dissent observes that the Washington statute permits a plan administrator to avoid resolving the dispute himself and to let courts or parties settle the matter. See post, at 158. This observation only presents an example of how the costs of delay and uncertainty can be passed on to beneficiaries, thereby thwarting ERISA's objective of efficient plan administration. Cf. Fort Halifax Packing Co. v. Coyne, 482 U. S. 1, 9 (1987).

congressional goal of "minimiz[ing] the administrative and financial burden[s]" on plan administrators—burdens ultimately borne by the beneficiaries. *Ingersoll-Rand Co.* v. *McClendon*, 498 U. S. 133, 142 (1990).

We recognize that all state laws create some potential for a lack of uniformity. But differing state regulations affecting an ERISA plan's "system for processing claims and paying benefits" impose "precisely the burden that ERISA preemption was intended to avoid." *Fort Halifax, supra,* at 10. And as we have noted, the statute at issue here directly conflicts with ERISA's requirements that plans be administered, and benefits be paid, in accordance with plan documents. We conclude that the Washington statute has a "connection with" ERISA plans and is therefore pre-empted.

## III

Respondents suggest several reasons why ordinary ERISA pre-emption analysis should not apply here. First, they observe that the Washington statute allows employers to opt out. According to respondents, the statute neither regulates plan administration nor impairs uniformity because it does not apply when "[t]he instrument governing disposition of the nonprobate asset expressly provides otherwise." Wash. Rev. Code § 11.07.010(2)(b)(i) (1994). We do not believe that the statute is saved from pre-emption simply because it is, at least in a broad sense, a default rule.

Even though the Washington statute's cancellation of private choice may itself be trumped by specific language in the plan documents, the statute does "dictate the choice[s] facing ERISA plans" with respect to matters of plan administration. *Dillingham, supra,* at 334. Plan administrators must either follow Washington's beneficiary designation scheme or alter the terms of their plan so as to indicate that they will not follow it. The statute is not any less of a regulation of the terms of ERISA plans simply because there are two ways of complying with it. Of course, simple noncom-

pliance with the statute is not one of the options available to plan administrators. Their only choice is one of timing, *i. e.*, whether to bear the burden of compliance *ex post*, by paying benefits as the statute dictates (and in contravention of the plan documents), or *ex ante*, by amending the plan.[4]

Respondents emphasize that the opt-out provision makes compliance with the statute less burdensome than if it were mandatory. That is true enough, but the burden that remains is hardly trivial. It is not enough for plan administrators to opt out of this particular statute. Instead, they must maintain a familiarity with the laws of all 50 States so that they can update their plans as necessary to satisfy the opt-out requirements of other, similar statutes. They also must be attentive to changes in the interpretations of those statutes by state courts. This "tailoring of plans and employer conduct to the peculiarities of the law of each jurisdiction" is exactly the burden ERISA seeks to eliminate. *Ingersoll-Rand, supra*, at 142.

Second, respondents emphasize that the Washington statute involves both family law and probate law, areas of traditional state regulation. There is indeed a presumption against pre-emption in areas of traditional state regulation such as family law. See, *e. g., Hisquierdo* v. *Hisquierdo*, 439 U. S. 572, 581 (1979). But that presumption can be overcome where, as here, Congress has made clear its desire for pre-emption. Accordingly, we have not hesitated to find state family law pre-empted when it conflicts with ERISA or relates to ERISA plans. See, *e. g., Boggs* v. *Boggs*, 520

---

[4] Contrary to the dissent's suggestion that the resolution of this case depends on one's view of federalism, see *post*, at 160–161, we are called upon merely to interpret ERISA. And under the text of ERISA, the fiduciary "shall" administer the plan "in accordance with the documents and instruments governing the plan," 29 U. S. C. § 1104(a)(1)(D). The Washington statute conflicts with this command because under this statute, the only way the fiduciary can administer the plan according to its terms is to change the very terms he is supposed to follow.

U. S. 833 (1997) (holding that ERISA pre-empts a state community property law permitting the testamentary transfer of an interest in a spouse's pension plan benefits).

Finally, respondents argue that if ERISA pre-empts this statute, then it also must pre-empt the various state statutes providing that a murdering heir is not entitled to receive property as a result of the killing. See, *e. g.,* Cal. Prob. Code Ann. §§ 250–259 (West 1991 and Supp. 2000); 755 Ill. Comp. Stat., ch. 755, § 5/2–6 (1999). In the ERISA context, these "slayer" statutes could revoke the beneficiary status of someone who murdered a plan participant. Those statutes are not before us, so we do not decide the issue. We note, however, that the principle underlying the statutes—which have been adopted by nearly every State—is well established in the law and has a long historical pedigree predating ERISA. See, *e. g., Riggs* v. *Palmer,* 115 N. Y. 506, 22 N. E. 188 (1889). And because the statutes are more or less uniform nationwide, their interference with the aims of ERISA is at least debatable.

\* \* \*

The judgment of the Supreme Court of Washington is reversed, and the case is remanded for further proceedings not inconsistent with this opinion.

*It is so ordered.*

JUSTICE SCALIA, with whom JUSTICE GINSBURG joins, concurring.

I join the opinion of the Court, since I believe that the "relate to" pre-emptive provision of the Employee Retirement Income Security Act of 1974 (ERISA) is assuredly triggered by a state law that contradicts ERISA. As the Court notes, "the statute at issue here directly conflicts with ERISA's requirements that plans be administered, and benefits be paid, in accordance with plan documents." *Ante,* at 150. I remain unsure (as I think the lower courts and everyone else will be) as to what else triggers the "relate to" pro-

vision, which—if it is interpreted to be anything other than a reference to our established jurisprudence concerning conflict and field pre-emption—has no discernible content that would not pick up every ripple in the pond, producing a result "that no sensible person could have intended." *California Div. of Labor Standards Enforcement* v. *Dillingham Constr., N. A., Inc.*, 519 U. S. 316, 336 (1997) (SCALIA, J., concurring). I persist in the view that we can bring some coherence to this area, and can give the statute both a plausible and precise content, only by interpreting the "relate to" clause as a reference to our ordinary pre-emption jurisprudence. See *ibid.*

JUSTICE BREYER, with whom JUSTICE STEVENS joins, dissenting.

Like JUSTICE SCALIA, I believe that we should apply normal conflict pre-emption and field pre-emption principles where, as here, a state statute covers ERISA and non-ERISA documents alike. *Ante* this page (concurring opinion). Our more recent ERISA cases are consistent with this approach. See *De Buono* v. *NYSA–ILA Medical and Clinical Services Fund*, 520 U. S. 806, 812–813 (1997) (rejecting literal interpretation of ERISA's pre-emption clause); *California Div. of Labor Standards Enforcement* v. *Dillingham Constr., N. A., Inc.*, 519 U. S. 316, 334 (1997) (narrowly interpreting the clause); *New York State Conference of Blue Cross & Blue Shield Plans* v. *Travelers Ins. Co.*, 514 U. S. 645, 656 (1995) ("go[ing] beyond the unhelpful text [of the clause] and the frustrating difficulty of defining its key term, and look[ing] instead to the objectives of the ERISA statute as a guide"). See also *Boggs* v. *Boggs*, 520 U. S. 833, 841 (1997) (relying on conflict pre-emption principles instead of ERISA's pre-emption clause). And I fear that our failure to endorse this "new approach" explicitly, *Dillingham, supra*, at 336 (SCALIA, J., concurring), will continue to produce an "avalanche of litigation," *De Buono, supra*, at 809, n. 1, as

courts struggle to interpret a clause that lacks any "discernible content," *ante*, at 153 (SCALIA, J., concurring), threatening results that Congress could not have intended.

I do not agree with JUSTICE SCALIA or with the majority, however, that there is any plausible pre-emption principle that leads to a conclusion that ERISA pre-empts the statute at issue here. No one could claim that ERISA pre-empts the entire *field* of state law governing inheritance—though such matters "relate to" ERISA broadly speaking. See *Travelers, supra*, at 655. Neither is there any direct conflict between the Washington statute and ERISA, for the one nowhere directly contradicts the other. Cf. *ante*, at 150 (claiming a "direc[t] conflic[t]" between ERISA and the Washington statute). But cf. *ante*, at 146 (relying upon the "relate to" language in ERISA's pre-emption clause).

The Court correctly points out that ERISA requires a fiduciary to make payments to a beneficiary "in accordance with the documents and instruments governing the plan." 29 U. S. C. § 1104(a)(1)(D). But nothing in the Washington statute requires the contrary. Rather, the state statute simply sets forth a default rule for interpreting documentary silence. The statute specifies that a nonprobate asset will pass at A's death "as if" A's "former spouse" had died first— *unless the "instrument governing disposition of the nonprobate asset expressly provides otherwise."* Wash. Rev. Code § 11.07.010(2)(b)(i) (1994) (emphasis added). This state-law rule is a rule of interpretation, and it is designed to carry out, not to conflict with, the employee's likely intention as revealed in the plan documents.

There is no direct conflict or contradiction between the Washington statute and the terms of the plan documents here at issue. David Egelhoff's investment plan provides that when a "beneficiary designation" is "invalid," the "benefits will be paid" to a "surviving spouse," or "[i]f there is no surviving spouse," to the "children in equal shares." App. 40. The life insurance plan is silent about what occurs when

a beneficiary designation is invalid. The Washington statute fills in these gaps, *i. e.*, matters about which the documents themselves say nothing. Thus, the Washington statute specifies that a beneficiary designation—here "Donna R. Egelhoff wife" in the pension plan—is invalid where there is no longer any such person as Donna R. Egelhoff, wife. See Appendix, *infra.* And the statute adds that in such instance the funds would be paid to the children, who themselves are potential pension plan beneficiaries.

The Court's "direct conflict" conclusion rests upon its claim that "administrators must pay benefits to the beneficiaries chosen by state law, rather than to those identified in the plan documents." *Ante,* at 147. But the Court cannot mean "identified *anywhere* in the plan documents," for the Egelhoff children were "identified" as recipients in the pension plan documents should the initial designation to "Donna R. Egelhoff wife" become invalid. And whether that initial designation became invalid upon divorce is a matter about which the plan documents are silent.

To refer to state law to determine whether a given name makes a designation that is, or has become, invalid makes sense where background property or inheritance law is at issue, say, for example, where a written name is potentially ambiguous, where it is set forth near, but not in, the correct space, where it refers to a missing person perhaps presumed dead, where the name was written at a time the employee was incompetent, or where the name refers to an individual or entity disqualified by other law, say, the rule against perpetuities or rules prohibiting a murderer from benefiting from his crime. Why would Congress want the courts to create an ERISA-related federal property law to deal with such problems? Regardless, to refer to background state law in such circumstances does not *directly* conflict with any explicit ERISA provision, for no provision of ERISA forbids reading an instrument or document in light of state property law principles. In any event, in this case the plan docu-

ments *explicitly* foresee that a beneficiary designation may become "invalid," but they do not specify the invalidating circumstances. *Supra*, at 154–155. To refer to state property law to fill in that blank cannot possibly create any direct conflict with the plan documents.

The majority simply denies that there is any blank to fill in and suggests that the plan documents require the plan to pay the designated beneficiary under all circumstances. See *ante*, at 147–148, n. 1. But there is nonetheless an open question, namely, whether a designation that (here explicitly) refers to a wife remains valid after divorce. The question is genuine and important (unlike the imaginary example in the majority's footnote). The plan documents themselves do not answer the question any more than they describe what is to occur in a host of other special circumstances (*e. g.*, mental incompetence, intoxication, ambiguous names, etc.). To determine whether ERISA permits state law to answer such questions requires a careful examination of the particular state law in light of ERISA's basic policies. See *ante*, at 147; *infra* this page and 157–159. We should not short circuit that necessary inquiry simply by announcing a "direct conflict" where none exists.

The Court also complains that the Washington statute restricts the plan's choices to "two." *Ante*, at 150. But it is difficult to take this complaint seriously. After all, the two choices that Washington gives the plan are (1) to comply with Washington's rule or (2) not to comply with Washington's rule. What other choices could there be? A state statute that asks a plan to choose whether it intends to comply is not a statute that directly conflicts with a plan. Quite obviously, it is possible, not "'impossible,'" to comply with both the Washington statute and federal law. *Geier* v. *American Honda Motor Co.*, 529 U. S. 861, 873 (2000).

The more serious pre-emption question is whether this state statute "'stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Con-

gress.'" *Ibid.* (quoting *Hines* v. *Davidowitz*, 312 U. S. 52, 67 (1941)). In answering that question, we must remember that petitioner has to overcome a strong presumption *against* pre-emption. That is because the Washington statute governs family property law—a "fiel[d] of traditional state regulation," where courts will not find federal preemption unless such was the "'clear and manifest purpose of Congress,'" *Travelers*, 514 U. S., at 655 (quoting *Rice* v. *Santa Fe Elevator Corp.*, 331 U. S. 218, 230 (1947)), or the state statute does "'major damage' to 'clear and substantial' federal interests," *Hisquierdo* v. *Hisquierdo*, 439 U. S. 572, 581 (1979) (quoting *United States* v. *Yazell*, 382 U. S. 341, 352 (1966)). No one can seriously argue that Congress has *clearly* resolved the question before us. And the only damage to federal interests that the Court identifies consists of the added administrative burden the state statute imposes upon ERISA plan administrators.

The Court claims that the Washington statute "interferes with nationally uniform plan administration" by requiring administrators to "familiarize themselves with state statutes." *Ante*, at 148–149. But administrators have to familiarize themselves with state law in any event when they answer such routine legal questions as whether amounts due are subject to garnishment, *Mackey* v. *Lanier Collection Agency & Service, Inc.*, 486 U. S. 825, 838 (1988), who is a "spouse," who qualifies as a "child," or when an employee is legally dead. And were that "familiarizing burden" somehow overwhelming, the plan could easily avoid it by resolving the divorce revocation issue in the plan documents themselves, stating expressly that state law does not apply. The "burden" thus reduces to a one-time requirement that would fall primarily upon the few who draft model ERISA documents, not upon the many who administer them. So meager a burden cannot justify pre-empting a state law that enjoys a presumption against pre-emption.

The Court also fears that administrators would have to make difficult choice-of-law determinations when parties live in different States. *Ante,* at 148–149. Whether this problem is or is not "major" in practice, the Washington statute resolves it by expressly setting forth procedures whereby the parties or the courts, *not* the plan administrator, are responsible for resolving it. See §§ 11.07.010(3)(b)(i)–(ii) (stating that a plan may "without liability, refuse to pay or transfer a nonprobate asset" until "[a]ll beneficiaries and other interested persons claiming an interest have consented in writing to the payment or transfer" or "[t]he payment or transfer is authorized or directed by a court of proper jurisdiction"); § 11.07.010(3)(c) (plan may condition payment on provision of security by recipient to indemnify plan for costs); § 11.07.010(2)(b)(i) (plan may avoid default rule by expressing its intent in the plan documents).

The Court has previously made clear that the fact that state law "impose[s] some burde[n] on the administration of ERISA plans" does not necessarily require pre-emption. *De Buono,* 520 U. S., at 815; *Mackey, supra,* at 831 (upholding state garnishment law notwithstanding claim that "benefit plans subjected to garnishment will incur substantial administrative burdens"). Precisely, what is it about this statute's requirement that distinguishes it from the " 'myriad state laws' " that impose some kind of burden on ERISA plans? *De Buono, supra,* at 815 (quoting *Travelers, supra,* at 668).

Indeed, if one looks beyond administrative burden, one finds that Washington's statute poses no obstacle, but furthers ERISA's ultimate objective—developing a fair system for protecting employee benefits. Cf. *Pension Benefit Guaranty Corporation* v. *R. A. Gray & Co.,* 467 U. S. 717, 720 (1984). The Washington statute transfers an employee's pension assets at death to those individuals whom the worker would likely have wanted to receive them. As many jurisdictions have concluded, divorced workers more often prefer that a child, rather than a divorced spouse, receive

those assets. Of course, an employee can secure this result by changing a beneficiary form; but doing so requires awareness, understanding, and time. That is why Washington and many other jurisdictions have created a statutory assumption that divorce works a revocation of a designation in favor of an ex-spouse. That assumption is embodied in the Uniform Probate Code; it is consistent with human experience; and those with expertise in the matter have concluded that it "more often" serves the cause of "[j]ustice." Langbein, The Nonprobate Revolution and the Future of the Law of Succession, 97 Harv. L. Rev. 1108, 1135 (1984).

In forbidding Washington to apply that assumption here, the Court permits a divorced wife, who *already* acquired, during the divorce proceeding, her fair share of the couple's community property, to receive in addition the benefits that the divorce court awarded to her former husband. To be more specific, Donna Egelhoff already received a business, an IRA account, and stock; David received, among other things, 100% of his pension benefits. App. 31–34. David did not change the beneficiary designation in the pension plan or life insurance plan during the 6-month period between his divorce and his death. As a result, Donna will now receive a windfall of approximately $80,000 at the expense of David's children. The State of Washington enacted a statute to prevent precisely this kind of unfair result. But the Court, relying on an inconsequential administrative burden, concludes that Congress required it.

Finally, the logic of the Court's decision does not stop at divorce revocation laws. The Washington statute is virtually indistinguishable from other traditional state-law rules, for example, rules using presumptions to transfer assets in the case of simultaneous deaths, and rules that prohibit a husband who kills a wife from receiving benefits as a result of the wrongful death. It is particularly difficult to believe that Congress wanted to pre-empt the latter kind of statute. But how do these statutes differ from the one before us?

Slayer statutes—like this statute—"gover[n] the payment of benefits, a central matter of plan administration." *Ante*, at 148. And contrary to the Court's suggestion, *ante*, at 152, slayer statutes vary from State to State in their details just like divorce revocation statutes. Compare Ariz. Rev. Stat. Ann. § 14–2803(F) (1995) (requiring proof, in a civil proceeding, under preponderance of the evidence standard); Haw. Rev. Stat. § 560:2–803(g) (1999) (same), with Ga. Code Ann. § 53–1–5(d) (Supp. 1996) (requiring proof under clear and convincing evidence standard); Me. Rev. Stat. Ann., Tit. 18–A, § 2–803(e) (1998) (same); and Ala. Code § 43–8–253(e) (1991) (treating judgment of conviction as conclusive when it becomes final); Me. Rev. Stat. Ann., Tit. 18–A, § 2–803(e) (1998) (same), with Ariz. Rev. Stat. Ann. § 14–2803(F) (1995) (treating judgment of conviction as conclusive only after "all right to appeal has been exhausted"); Haw. Rev. Stat. § 560:2–803(g) (1999) (same). Indeed, the "slayer" conflict would seem more serious, not less serious, than the conflict before us, for few, if any, slayer statutes permit plans to opt out of the state property law rule.

"ERISA pre-emption analysis," the Court has said, must "respect" the "separate spher[e]" of state "authority." *Fort Halifax Packing Co.* v. *Coyne*, 482 U. S. 1, 19 (1987) (quoting *Alessi* v. *Raybestos-Manhattan, Inc.*, 451 U. S. 504, 522 (1981)) (internal quotation marks omitted). In so stating, the Court has recognized the practical importance of preserving local independence, at retail, *i. e.*, by applying pre-emption analysis with care, statute by statute, line by line, in order to determine how best to reconcile a federal statute's language and purpose with federalism's need to preserve state autonomy. Indeed, in today's world, filled with legal complexity, the true test of federalist principle may lie, not in the occasional constitutional effort to trim Congress' commerce power at its edges, *United States* v. *Morrison*, 529 U. S. 598 (2000), or to protect a State's treasury from a private damages action, *Board of Trustees of Univ. of Ala.* v.

*Garrett,* 531 U. S. 356 (2001), but rather in those many statutory cases where courts interpret the mass of technical detail that is the ordinary diet of the law, *AT&T Corp.* v. *Iowa Utilities Bd.,* 525 U. S. 366, 427 (1999) (BREYER, J., concurring in part and dissenting in part).

In this case, "field pre-emption" is not at issue. There is no "direct" conflict between state and federal statutes. The state statute poses no significant obstacle to the accomplishment of any federal objective. Any effort to squeeze some additional pre-emptive force from ERISA's words (*i. e.,* "relate to") is inconsistent with the Court's recent case law. And the state statute before us is one regarding family property—a "fiel[d] of traditional state regulation," where the interpretive presumption against pre-emption is particularly strong. *Travelers,* 514 U. S., at 655. . For these reasons, I disagree with the Court's conclusion. And, consequently, I dissent.