# UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

MARY EMMA BOYD; W.P. BOYD, as
Personal Representative of the
Estate of Emma C. Boyd,

      *Plaintiffs-Appellants,*

v.

METROPOLITAN LIFE INSURANCE
COMPANY,

      *Defendant-Appellee.*

SECRETARY OF LABOR,

      *Amicus Supporting Appellee.*

No. 10-1702

Appeal from the United States District Court
for the District of South Carolina, at Charleston.
C. Weston Houck, Senior District Judge.
(2:09-cv-03325-CWH)

Argued: January 27, 2011

Decided: March 31, 2011

Before WILKINSON, MOTZ, and DUNCAN,
Circuit Judges.

Affirmed by published opinion. Judge Wilkinson wrote the
opinion, in which Judge Motz and Judge Duncan joined.

**COUNSEL**

**ARGUED:** Robert Edward Hoskins, FOSTER LAW FIRM, LLP, Greenville, South Carolina, for Appellants. Lowell David Kass, METROPOLITAN LIFE INSURANCE COMPANY, New York, New York, for Appellee. Jamila B. Minnicks, UNITED STATES DEPARTMENT OF LABOR, Washington, D.C., for Amicus Supporting Appellee. **ON BRIEF:** Elizabeth J. Bondurant, SMITH MOORE LEATHERWOOD LLP, Atlanta, Georgia; William H. Jordan, SMITH MOORE LEATHERWOOD LLP, Greenville, South Carolina, for Appellee. M. Patricia Smith, Solicitor of Labor, Timothy D. Hauser, Associate Solicitor for Plan Benefits Security, Nathaniel I. Spiller, Counsel for Appellate and Special Litigation, UNITED STATES DEPARTMENT OF LABOR, Washington, D.C., for Amicus Supporting Appellee.

---

**OPINION**

WILKINSON, Circuit Judge:

Emma C. Boyd was an employee of Delta Airlines, Inc. who participated in a life insurance plan administered by Metropolitan Life Insurance Company ("MetLife") and governed by the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1001 *et seq.* At the time of Emma's death in November 2008, the plan documents on file with MetLife designated Emma's husband, Robert Alsager, as the primary beneficiary of the plan. MetLife thus paid the plan proceeds to Alsager even though he and Emma had separated and even though he had previously signed a separation agreement in family court waiving any claim to the benefits.

In response, Mary Emma Boyd (Emma's mother) and W. P. Boyd (Mary Emma's son and the personal representative of Emma's estate) filed this suit, claiming eligibility for the

benefits on the theory that Alsager had relinquished his right to receive them. The district court dismissed their suit, concluding that MetLife had fulfilled its statutory duty under ERISA by awarding benefits to the beneficiary designated in the documents Emma filed with the plan. We agree. The Boyds' arguments are foreclosed by the Supreme Court's recent decision in *Kennedy v. Plan Administrator for DuPont Savings & Investment Plan*, 129 S. Ct. 865 (2009), and we therefore affirm the judgment.

## I.

The facts of this case are both brief and undisputed. Emma C. Boyd, a resident of Charleston, South Carolina, worked for Delta Airlines until her untimely death. As a Delta employee, she participated in a life insurance plan governed by the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1001 *et seq.* The plan allowed her to designate a beneficiary in her application or in her enrollment form; that person would be first in line to receive the proceeds of the policy. Moreover, Emma could unilaterally change the designated beneficiary at any time by sending a signed and dated written request to MetLife. In the event that Emma failed to designate a beneficiary or had no surviving beneficiary at the time of her death, the plan made clear that MetLife would disburse benefits to her estate. The plan did not specify any procedure for beneficiaries to follow in order to waive their claims to benefits.

On December 10, 2001, Emma filed a beneficiary designation form naming her husband, Robert Alsager, as the primary beneficiary of the plan. Emma also designated her mother, Mary Emma Boyd, as the contingent beneficiary in the event that Alsager refused to take the benefits. Roughly six years later, however, Emma and Alsager separated. In April 2008, the family court in Charleston, South Carolina entered an order approving Emma and Alsager's separation and property settlement agreement. One provision of that agreement

released Emma's and Alsager's claims to the other's estate or property:

> Each party relinquishes and disclaims all right, claim or interest whether actual, inchoate or contingent, in law and in equity that she or he may acquire in the property or estate of the other, including without limitation . . . the right to receive proceeds, funds or property as a beneficiary under any life insurance policies.

While Emma obtained Alsager's signature on that agreement, she never changed the beneficiary designation on file with MetLife, meaning that Alsager remained the primary beneficiary under the plan.

On November 8, 2008, Emma passed away. Mary Emma Boyd and her son, W. P. Boyd ("the Boyds"), filed a claim for the benefits from the life insurance policy. Despite having signed the settlement agreement, Alsager filed a claim as well. Relying on the plan documents on file, MetLife determined that the benefits should be paid to Alsager and denied the Boyds' claim. MetLife indicated at oral argument that it has since paid the benefits to Alsager.

The Boyds then sent a letter to MetLife appealing the denial of their claim, arguing that Alsager had waived any right to recover benefits when he signed the property settlement agreement. After MetLife replied with a letter upholding the denial of benefits, the Boyds filed suit under 29 U.S.C. § 1132(a)(1)(B) — which permits an individual to file a civil action "to recover benefits due to him under the terms of his plan" or "to enforce his rights under the terms of the plan" — in district court in December 2009. The court granted MetLife's motion to dismiss the Boyds' suit on June 15, 2010, concluding that MetLife had carried out its statutory obligations by disbursing benefits in accordance with the ben-

eficiary designation form on file with the plan. This appeal followed.

## II.

Enacted in 1974, ERISA established a "comprehensive and complex scheme" for regulating private pension plans. *Borden, Inc. v. Bakery & Confectionery Union & Indus. Int'l Pension*, 974 F.2d 528, 529 (4th Cir. 1992). In order to protect plan participants and beneficiaries from fiduciary abuses, ERISA requires plan administrators to "discharge [their] duties with respect to a plan solely in the interest of the participants and beneficiaries," and to do so "for the exclusive purpose of . . . providing benefits to participants and their beneficiaries[ ] and . . . defraying reasonable expenses of administering the plan." 29 U.S.C. § 1104(a)(1). To that end, plan administrators must act "in accordance with the documents and instruments governing the plan insofar as such documents and instruments are consistent with" the other provisions of ERISA. 29 U.S.C. § 1104(a)(1)(D). Indeed, Congress identified the need to follow plan documents as a "core principle[ ]" of the act. *See* S. Rep. No. 93-127, at 30 (1974), *reprinted in* 1974 U.S.C.C.A.N. 4838, 4866.

In *Kennedy v. Plan Administrator for DuPont Savings & Investment Plan*, 129 S. Ct. 865 (2009), the Supreme Court construed 29 U.S.C. § 1104(a)(1)(D) as a broad endorsement of the "plan documents rule," *Kennedy*, 129 S. Ct. at 877, under which plan administrators look solely at "the directives of the plan documents" in determining how to disburse benefits, *id.* at 875. In other words, a claim for benefits must "stand[ ] or fall[ ] by 'the terms of the plan.'" *Id.* (quoting 29 U.S.C. § 1132(a)(1)(B)). This rule followed the plain text of the statute, which instructs employers to distribute benefits "in accordance with the documents and instruments governing the plan." 29 U.S.C. § 1104(a)(1)(D). It also accorded with the statute's purpose, as "ERISA's statutory scheme 'is built around reliance on the face of written plan documents.'" *Ken-*

*nedy*, 129 S. Ct. at 875 (quoting *Curtiss-Wright Corp. v. Schoonejongen*, 514 U.S. 73, 83 (1995)).

Moreover, as the Court noted, the rule makes good sense. The plan documents rule provides plan participants with "a clear set of instructions for making [their] own instructions clear." *Id.* It gives employers "clear distribution instructions, without going into court," *id.* at 876, and thus permits them to create "a uniform administrative scheme, [with] a set of standard procedures to guide processing of claims and disbursement of benefits," *id.* at 875 (quoting *Egelhoff v. Egelhoff*, 532 U.S. 141, 148 (2001)). And it avoids the complications, delays, and costs inherent in requiring administrators to examine external documents in an attempt to piece together a plan participant's intent. In short, the plan documents rule ensures "that beneficiaries get what's coming quickly, without the folderol essential under less-certain rules." *Id.* at 875-76 (quoting *Fox Valley & Vicinity Constr. Workers Pension Fund v. Brown*, 897 F.2d 275, 283 (7th Cir. 1990) (Easterbrook, J., dissenting)).

*Kennedy*, however, did not just announce the plan documents rule. It also confirmed the rule's soundness through application. In *Kennedy*, the Court confronted a situation where Kennedy's ex-wife was party to a divorce decree divesting her of any right to proceeds from Kennedy's retirement or pension plans, but where she remained the designated beneficiary of one of Kennedy's pension benefit plans in the documents on file with the plan. *Id.* at 868-69. Upon Kennedy's death, the executrix of his estate claimed that the funds from that pension plan should be distributed to the estate insofar as Kennedy's ex-wife had waived any claim to benefits under the divorce decree. *Id.* at 869. But the Court rejected that argument, concluding that the plan administrator "was [not] required to honor [the ex-wife's] waiver with the consequence of distributing the [plan] balance to the Estate," but instead was statutorily required to distribute benefits in accordance with the documents on file. *Id.* at 874-75.

In other words, even though Kennedy's ex-wife's waiver was clear, the Court concluded that it could not trump the plan documents. In its view, requiring plan administrators to analyze such waivers would involve them in thorny questions about "whether a claimed federal common law waiver was knowing and voluntary, whether its language addressed the particular benefits at issue, and so forth." *Id.* at 876. Such an approach would be time-consuming and ultimately unnecessary, given that both the participant and the beneficiary could head such situations off at the pass: the participant by filing a change of beneficiary form — "an easy way" to make his intent pellucid, *id.* at 877, and the beneficiary by refusing to take the benefits to avoid further litigation, *id.* at 872. Finally, and perhaps most importantly, the Court noted that undermining the plan documents rule could lead to costly "litigation like this over the meaning and enforceability of purported waivers," destroying the administrator's ability "to get clear distribution instructions[ ] without going into court." *Id.* at 876.

Seeing little need to encourage the "factually complex and subjective determinations" that would arise under a contrary approach, the Court endorsed the plan documents rule across the board. *Id.* at 876; *see also Carmona v. Carmona*, 603 F.3d 1041, 1060-61 (9th Cir. 2010) (confirming, in the aftermath of *Kennedy*, that plan administrators must "'hew[ ] to the directives of the plan documents' rather than 'examin[e] a multitude of external documents that might purport to affect the dispensation of benefits'") (quoting *Kennedy*, 129 S. Ct. at 875, 876); *In re Radcliffe*, 563 F.3d 627, 633 (7th Cir. 2009) ("Under *Kennedy*, the administrator is obligated to pay the benefits in conformity with plan documents without resort to external documents.") There was only one caveat to the Court's holding: in footnote 13 of the opinion, the Court stated that its ruling did not "address a situation in which the plan documents provide no means for a beneficiary to renounce an interest in benefits," unlike the plan in *Kennedy*. *Id.* at 877 n.13.

With these principles in mind, we turn to the Boyds' argument that Alsager's waiver of benefits in the separation agreement should prevent him from taking benefits under the MetLife plan.

## III.

### A.

At first blush, *Kennedy* seems rather straightforwardly to foreclose the Boyds' claims. As in *Kennedy*, it is undisputed that the plan documents on file at the time of Emma's death declared Alsager to be the primary beneficiary of the plan, as Emma never took advantage of her option to designate a new beneficiary. *See Kennedy*, 129 S. Ct. at 869. As in *Kennedy*, Alsager waived any claim to the benefits as part of his divorce proceedings. *See id.* And as in *Kennedy*, the Boyds' chief argument on appeal is that Alsager's waiver can and should trump the plan documents on file. *See id.* at 869-70. Given these similarities, it is difficult to see why we should not reach a similar conclusion to the Court's: that Alsager's waiver does not supersede plan documents, and that Metlife acted properly in disbursing benefits according to the plan documents on file.

The Boyds initially argue that *Kennedy* is factually distinguishable, but their arguments on that score lack merit. First, the Boyds observe that Alsager actually signed a waiver in the presence of witnesses, whereas Kennedy's ex-wife was merely party to a court decree divesting her of the plan proceeds. *See id.* at 869. But this is a distinction without a difference: nothing in *Kennedy* turned on whether there were adequate indicia of Kennedy's ex-wife's intent to disclaim, and nothing about the Court's holding suggested that the Court would have reached a different result if Kennedy's ex-wife had put pen to paper. *See id.* at 875-76.

Next, the Boyds contend that *Kennedy* is not on point because it involved an ERISA "employee pension benefit

plan" under 29 U.S.C. § 1002(2), whereas this case involves an ERISA "employee welfare benefit plan" under 29 U.S.C. § 1002(1). But as the Boyds themselves observe, this purported basis of distinction is "not as significant." Appellants' Br. at 12. Neither *Kennedy* nor 29 U.S.C. § 1104(a)(1)(D) provides any basis for concluding that the plan documents rule only applies to employee pension benefit plans. Indeed, in deciding to broadly endorse the plan documents rule, *Kennedy* drew upon case law involving employee welfare benefit plans — an odd decision if employee welfare benefit plans and employee pension benefit plans were somehow different. *See Kennedy*, 129 S. Ct. at 875 (citing *Egelhoff v. Egelhoff*, 532 U.S. 141, 148 (2001)).*

B.

The Boyds' further response is that *Kennedy* is not controlling. As the Boyds point out, the MetLife plan at issue here — unlike the pension plan at issue in *Kennedy*, *see* 129 S. Ct. at 877 — contains no formal "means for a beneficiary to renounce an interest in benefits," *id.* at 877 n.13. On their view, this case thus falls within the class of situations the Court "d[id] not address." *Id.* But that is not all: the Boyds do not just argue that *Kennedy* is not controlling — they also argue that the plan documents rule *does not apply* in situations where a plan has no formal mechanism for beneficiaries to renounce benefits. Thus, the Boyds contend, Alsager's waiver in the separation agreement should carry the day.

The chief problem with the Boyds' argument, however, is that footnote 13 cannot bear the weight they would place on it. For starters, it is unclear that the footnote has any relevance to this case, given that Alsager did not show any interest in

---

*In the district court, the Boyds relied on *Estate of Altobelli v. IBM Corp.*, 77 F.3d 78 (4th Cir. 1996). However, *Altobelli* is inconsistent with the *Kennedy* decision. *See Kennedy*, 129 S. Ct. at 875-76. On appeal, the Boyds disclaimed reliance on that case. *See* Appellants' Br. at 19 n.4.

renouncing the benefits once Emma passed away. It might be significant that plan documents provide no means for a beneficiary to waive benefits in a scenario where the beneficiary actually wishes to refuse them: in that situation, strict application of the plan documents rule would create the absurd result of forcing the beneficiary to take benefits that he does not want. *See id.* at 872. Here, however, Alsager filed a claim for benefits, belying any claim that he wanted to refuse them.

Moreover, regardless of whether footnote 13 is pertinent, it makes little sense to read it as hinging the applicability of the plan documents rule on whether the plan features formal procedures for waiver. Before concluding that Kennedy's ex-wife's waiver could not trump the plan documents, the Court ruled that the ex-wife's waiver was not null and void under ERISA's anti-alienation provision, which prevents a beneficiary from attempting to convey her interest in plan benefits to another party. *See id.* at 870-72; *see also* 29 U.S.C. § 1056(d)(1). In concluding that § 1056(d)(1) does not preclude waivers of benefits, the Court discussed at length the ways in which ERISA drew on the law of spendthrift trusts, under which the beneficiary "traditionally . . . ha[d] the power to disclaim prior to accepting" his interest. *Kennedy*, 129 S. Ct. at 871-72. As the Court observed, "[a] designated beneficiary of a spendthrift trust is not required to accept or retain an interest prescribed by the terms of the trust." *Id.* at 872 (quoting 2 Restatement (Third) of Trusts § 58(1), cmt. *c* (2001)). Furthermore, the right to disclaim benefits is not just grounded in "common law," but also in "[c]ommon sense": the law "certainly is not so absurd as to force a man to take an estate against his will," *id.* (quoting *Townson v. Tickell*, 106 Eng. Rep. 575, 576-77 (K.B. 1819)).

But if an ERISA plan beneficiary always has the option to refuse benefits at the moment of distribution — as *Kennedy* indicates and as MetLife represented at oral argument — then the only way a plan really could "provide no means for a beneficiary to renounce an interest in benefits" under footnote 13,

*id.* at 877 n.13, would be if the plan somehow prevented the beneficiary from refusing to take the insurance proceeds. As the Secretary of Labor has aptly noted, "[i]nsofar as, pursuant to *Kennedy*, no person can be forced to accept a benefit against his or her will, a person's right of refusal to accept benefits otherwise payable to him or her is self-executing and requires no express incorporation by a plan in order to make the refusal permissible." Amicus Br. of Sec'y of Labor at 17-18. Again, Alsager had every chance to waive his right and refuse the insurance proceeds. He wished to accept them, however, and the plan documents required the plan administrator to respect his wishes.

In short, the Boyds' arguments do not provide any basis for this court to depart from the clear and evident thrust of the *Kennedy* decision. Nothing in *Kennedy* authorizes a plan administrator to disregard a validly executed beneficiary designation form where the beneficiary has made no effort to disclaim his right to benefits. Rather, the Court wished to give meaning to the plain intent of Congress in 29 U.S.C. § 1104(a)(1)(D), *see Kennedy*, 129 S. Ct. at 875-76; it wished to provide beneficiaries the prospect of prompt receipt of benefits without the burdens of uncertainty, *see id.*; and it wished to relieve plan administrators of the need to divine obscure participant intentions and of the specter of a lengthy fight in court, *see id.* at 875-76.

MetLife represented at oral argument that it may well set forth formal disclaimer procedures in its plans going forward. But even where such procedures are absent, the beneficiary can still make his intent clear by refusing to take benefits. Moreover, to the extent the plan participant wishes to direct benefits to a different party, she can simply change the designation on file. Given the easy availability of these options — not to mention their simplicity — we see no reason to force plan administrators to scrutinize waivers extrinsic to plan documents. That approach would bring about the very same results that led the Court in *Kennedy* to adopt the plan docu-

ments rule in the first place: the difficulties of determining whether a waiver was adequate, knowing, and voluntary; the delay in the disbursement of benefits caused by increased uncertainty over how to proceed; and the increased likelihood of administrators throwing themselves squarely into the center of contentious family disputes and exposing themselves to ceaseless litigation. *Id.* at 875-76. None of these consequences are we prepared to risk, as we would be doing if we overturned the district court.

## C.

We need not rest our ruling merely on our interpretation of *Kennedy*, for the Eighth Circuit addressed this very issue in *Matschiner v. Hartford Life & Accident Insurance Co.*, 622 F.3d 885 (8th Cir. 2010). The facts of *Matschiner* are functionally identical: the plan at issue did not set forth any "formal procedures" for waiver, *Matschiner*, 622 F.3d at 888, and the plan documents on file at the time of the participant's death named the participant's ex-husband as a beneficiary of the plan, even though the ex-husband was party to a divorce decree relinquishing his interest in the proceeds of his ex-wife's life insurance policies, *id.* at 886, 889.

Faced with these circumstances, the Eighth Circuit had little difficulty reaching the same conclusions we reach here: that "the plan documents, not the divorce decree, are controlling," and that footnote 13 only addresses situations where a plan "preclud[es] a pension benefit plan beneficiary from disclaiming an unwanted interest." *Id.* at 888. And it relied on similar reasoning: that the Court "did not intend to exempt from the plan documents rule all welfare benefit plans that do not contain an express waiver-of-benefits provision." *See id.*

Moreover, the Secretary of Labor — who possesses considerable enforcement authority with respect to Title I of ERISA, *see, e.g.*, 29 U.S.C. §§ 1002(13), 1132; *Sec'y of Labor v. Fitzsimmons*, 805 F.2d 682, 688-91 (7th Cir. 1986) — agrees with

MetLife. Both in its amicus brief and at oral argument, the Secretary argued convincingly for affirming the district court on the grounds that *Kennedy*, and by extension the "plan documents rule," required MetLife to distribute benefits exactly as it did. Amicus Br. of Sec'y of Labor at 8. In the Secretary's view, footnote 13 is simply not implicated here because Alsager "made no effort to disclaim his right to benefits," *id.* at 9, and because the footnote only applies in situations where the plan "affirmatively state[s] that disclaimer is not permitted under the plan," *id.* at 17. By contrast, where the plan does not preclude waiver but merely fails to set forth formal procedures, plan administrators are "not required or expected to consider 'a multitude of external documents that might purport to affect the dispensation of benefits.'" *Id.* at 13 (quoting *Kennedy*, 129 S. Ct. at 876).

Both the Eighth Circuit and the Secretary of Labor thus confirm that the Boyds' position is not sustainable. If MetLife had ignored the beneficiary designation form on file and given dispositive weight to the separation agreement, it would have contravened the text of 29 U.S.C. § 1104(a)(1)(D), the terms of the plan, and the core principles animating *Kennedy*. None of this means that the separation agreement is irrelevant. Its interpretation and enforcement, however, are not matters for the plan administrator, but are between Alsager and the Boyds.

In sum, we see no need and possess no warrant to unwind *Kennedy* and make a puzzle of plan administration, especially given that Congress has provided an alternative that is simultaneously clearer and more sensible. *See Kennedy*, 129 S. Ct. at 875-76, *Matschiner*, 622 F.3d at 887. Inasmuch as MetLife did what the law required it to do, the case against it must be dismissed and the judgment of the district court must be affirmed.

*AFFIRMED*